No. 26-4023

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

NAPHTALI RENSHAW; SUSAN BARNHART; TYRRAS WARREN; MICHAEL
CARRIGAN; CHRISTOPHER ROMPALA; AND CHARLES AREFORD

Plaintiffs-Appellees,

v.

UNITED STATES GENERAL SERVICES ADMINISTRATION

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the District of Oregon

———————————

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR AN EXTENSION OF ADMINISTRATIVE STAY
AND STAY PENDING APPEAL:
RELIEF REQUESTED BY 5:00 P.M. PDT TODAY**

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

SCOTT E. BRADFORD
*United States Attorney*

MARK R. FREEMAN
STEVEN A. MYERS
BRENNA H. SCULLY
*Attorneys, Appellate Staff*
*Civil Division, Room 7211*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 880-6114*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................ii

TABLE OF AUTHORITIES ..........................................................................iii

INTRODUCTION ...................................................................................... 1

STATEMENT............................................................................................ 5

ARGUMENT........................................................................................... 10

      I.   The Government Is Likely To Succeed On The Merits. ........................ 10

      II.  The Remaining Stay Factors Decisively Favor The Government........... 20

CONCLUSION ....................................................................................... 23

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU of Nev. v. City of Las Vegas,*
333 F.3d 1092 (9th Cir. 2003) .................................................................... 10

*Adderley v. Florida,*
385 U.S. 39 (1966) ........................................................................... 14, 16

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009) .................................................................. 16

*Brunette v. Humane Soc'y of Ventura Cnty.,*
40 F. App'x 594 (9th Cir. 2002) ............................................................... 14

*Cohen v. Cowles Media Co.,*
501 U.S. 663 (1991) ................................................................................ 13

*Collins v. Jordan,*
110 F.3d 1363 (9th Cir. 1996) .................................................................. 16

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
657 F.3d 936 (9th Cir. 2011) ............................................................... 15-16

*Cox v. New Hampshire,*
312 U.S. 569 (1941) ............................................................................ 13-14

*Dolan v. City of Tigard,*
512 U.S. 374 (1994) ................................................................................ 14

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,*
308 F.3d 1114 (10th Cir. 2002) ................................................................ 11

*Golden Press, Inc. v. Rylands,*
235 P.2d 592 (Colo. 1951) ....................................................................... 21

*Hale v. Department of Energy,*
806 F.2d 910 (9th Cir. 1986) ............................................................... 12, 22

*IMDb.com Inc. v. Becerra,*
962 F.3d 1111 (9th Cir. 2020) .................................................................. 13

*International Soc'y for Krishna Consciousness, Inc. v. Lee,*
  505 U.S. 672 (1992) ................................................................ 11

*Kaiser Aetna v. United States,*
  444 U.S. 164 (1979) ................................................................ 14

*L.W. ex rel. Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023), *aff'd sub nom.,*
  *United States v. Skrmetti,* 605 U.S. 495 (2025) ................................ 17

*Linthicum v. Wagner,*
  94 F.4th 887 (9th Cir. 2024) ..................................................... 14-15

*Michigan Dep't of State Police v. Sitz,*
  496 U.S. 444 (1990) ................................................................ 21-22

*Newsom v. Trump,*
  141 F.4th 1032 (9th Cir. 2025) (per curiam) ................................... 20-21

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................ 10

*Perry Educ. Ass'n v. Perry Loc. Educators'Ass'n,*
  460 U.S. 37 (1983) ................................................................ 10, 11, 18

*Project Veritas v. Schmidt,*
  125 F.4th 929 (9th Cir. 2025) (en banc) ....................................... 19

*Venetian Casino Resort, LLC v. Local Joint Exec. Bd. of L.V.,*
  257 F.3d 937 (9th Cir. 2001) ..................................................... 11

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ................................................................ 12, 13, 14, 16

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................................ 15, 18

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................ 4, 5, 19, 22

**Statutes**

40 U.S.C. § 1315 ..................................................................... 5

**Other Authorities**

56 RCNY 1-03 ............................................................................................ 16

U.S. GSA, *GSA Announces Reopening of Front Street to Vehicle Traffic*
   (June 21, 2021), https://perma.cc/FC46-LXJZ ......................................... 16

## INTRODUCTION

The government respectfully requests a stay pending appeal of the district court's preliminary injunction, which requires the government to remove a fence protecting federal property and personnel by 7:00 a.m. PDT tomorrow. Additionally, because the district court has now reinstated the prior deadline notwithstanding the administrative stay previously entered by this Court, the government respectfully requests that the Court extend its administrative stay pending disposition of the government's stay motion **by 5:00 p.m. tonight**.[1] An immediate administrative stay is necessary to ensure that this Court may consider the government's stay motion, especially given that the district court has threatened to hold the government in contempt if the fence is still standing tomorrow morning.

As this Court is aware, the district court ordered the government to remove a security fence protecting federal property and personnel by 7:00 a.m. PDT on Thursday, July 2. In promptly seeking an administrative stay from this Court, the government explained that it expected to begin taking down the fence on Monday evening to ensure compliance with that deadline. This Court granted an administrative stay on Friday, which it later extended through Tuesday morning

---

[1] At 6:43 p.m PDT last night, the government requested plaintiffs' position on this motion by 8:00 a.m. PDT this morning. Plaintiffs have not yet responded. The government requested identical relief orally on June 24, which the district court denied, Dkt.38, and in a written filing on July 1, Dkt.52. We will notify this Court if the district court acts.

before "remand[ing] for the district court to consider and clarify" alternative fencing options and extending the administrative stay "until the issuance of [the] district court's further order." Order (June 30, 2026). In reliance on the Court's orders granting and then extending the administrative stay, the government did not begin removing the fence.

Five hours after this Court entered its remand order, the district court held an evidentiary hearing. At 11:20 p.m. PDT last night, the court issued an order clarifying its findings. The court determined that "issuance of *this* order terminates the administrative stay," meaning that the government must remove the fence by the prior deadline of 7:00 a.m. tomorrow. Dkt.51, at 11. The court scheduled a hearing for 9:00 a.m. tomorrow morning to "determine Defendant's compliance." *Id.* And during the evidentiary hearing, the court threatened to hold the government in contempt if it is not in compliance by the deadline. Because the district court has forced the government to choose between facing contempt proceedings and forgoing any opportunity to seek appellate review of the injunction, this Court's immediate intervention is required to protect its jurisdiction and ensure orderly review of the government's stay motion and appeal.

Beginning in September 2025, aggressive and violent protest activity occurred at the Eugene Federal Building. On one occasion, protesters attempted to breach the building and tampered with access control systems. Dkt.42, at 5. On another, protesters shattered windows and successfully breached the building's interior. *Id.* at

2

6. In response, the government installed a temporary security fence around a portion of an outdoor plaza abutting the building, preventing members of the public from physically accessing that space but leaving accessible another portion of the plaza that can accommodate about 250 people. The fence, as well as the portion of the plaza that it cordons off, fall entirely within federal property.

The district court nevertheless ordered the government to remove the fence on the theory that it violated plaintiffs' First Amendment right to protest in the fenced-off portion of the plaza. That injunction is wholly unmoored from the First Amendment, which does not limit the government's ability to temporarily or permanently close government property to the public. This is true even if that property had previously been used for expressive activities. Indeed, the government regularly closes its property (including traditional public fora) to the public for a host of reasons—not only for security purposes, but also, for example, to repair sidewalks and streets and construct new buildings. Later this week, governments across the country will close streets, sidewalks, and parks to public access—all traditional public fora—to put on fireworks displays. Such closures do not implicate the First Amendment because they prevent speakers and non-speakers alike from accessing the property. No authority supports the district court's contrary conclusion, which if accepted would subject all manner of street closures and other access restrictions to heightened First Amendment scrutiny.

The district court compounded its error by concluding that plaintiffs were entitled to preliminary injunctive relief without considering the remaining equitable factors. That approach is foreclosed by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), which provides that plaintiffs seeking injunctive relief must independently satisfy all four factors of the preliminary-injunction standard. And the remaining factors, which decisively favor the government, only underscore why a stay is warranted.

By requiring the government to remove the fence, the injunction endangers federal employees, members of the public who seek federal services at the building, and the building itself. It is also inequitable to require removal of the fence pending disposition of whether its installation was lawful—indeed, in a manner that would functionally preclude any higher court from considering the legality of the district court's order. The government will incur significant and unrecoverable costs to remove the fence, and the government would incur those same costs again to reinstall the fence were it to prevail on appeal.

The court also exceeded its authority by second-guessing the government's safety assessments about how much fencing was necessary and precisely where on federal property the fence should be placed. The court even went as far as to itself propose an alternative fence design. By micromanaging how the Executive Branch chooses to protect its property and personnel, the injunction violates separation-of-powers principles.

4

## STATEMENT

**A.** The Eugene Federal Building is managed by the General Services Administration (GSA), Dkt.26, at 2, and protected by Federal Protective Service (FPS), the law-enforcement component within the Department of Homeland Security charged with protecting federal facilities and persons therein, *id.* at 1-2; 40 U.S.C. § 1315.

The building contains a plaza, which includes a lower area (the Lower Plaza) and, up a flight of stairs, an upper area (the Upper Plaza). Dkt.1, at 8. Although the plaza was "not designed to be a First Amendment location," Dkt.39, at 16, protests have historically been held throughout the plaza, Dkt.42, at 2-4. Beginning in September 2025, however, "large protest activity . . . created safety, security, and operational concerns for the federal agencies assigned to the Facility, the employees who work there, members of the public seeking services, and the Facility's infrastructure." Dkt.25, at 2.

On September 23, 2025, protestors "attempt[ed] to forcefully enter the building and tampered with the gate card reader and Airphone Intercom system."" Dkt.42, at 5. "Three individuals were cited, one of whom was arrested for throwing a 4-foot metal sign at officers." *Id.*

"'[S]everal incidents'" involved "activists 'harras[ing] the public, including veterans'" and federal employees. Dkt.42, at 5-6; Dkt.25 at 2. "The Veterans Health Administration ('VHA') complained to GSA that veteran services were affected,"

Dkt.42, at 6, and ultimately vacated the building after "determin[ing] that it could no longer safely and reliably meet its mission," Dkt.25, at 3, because of "veteran encounters with protestors," Dkt.42, at 6-7.

On January 30, 2026, things got even worse: during a demonstration involving approximately 400 people, protestors "breached the lobby of the Federal Building after shattering multiple windows," requiring the building to be evacuated for safety reasons. Dkt.42, at 6. Days later, on February 2, 2026, a rock was thrown at a second-floor window, breaking it. *Id.* The building remained closed until approximately February 9 so that GSA could clean the building and ensure it was safe to reenter. Dkt.25, at 4.

**B.** In response to the interference with its operations, the government began considering the installation of a security fence in mid-January. Dkt.42, at 6. "The purpose of the proposed fencing was to provide an additional layer of protection for federal employees, visitors, tenants, and Facility infrastructure." Dkt.25, at 2.

A temporary non-scalable security fence, Dkt.26, at 10, was installed on April 30, 2026. Dkt.42, at 7-8. The fence restricts public access to the Upper Plaza, effectively closing that property to the public. *Id.* at 7 (aerial photograph); Dkt.39, at 73 ("[T]here is no access at all for anybody in the upper plaza."). The fence "was designed to protect the facility, to protect its occupants and visitors, to allow a setback for ongoing repairs to damage caused during the [January 30] riot, and to allow

6

contractors to complete a hardening project on the lobby and exterior doors of the facility." Dkt.42, at 8. The Lower Plaza, which contains approximately 5,640 square feet and can accommodate about 250 people, "was intentionally left accessible to accommodate free speech activities." *Id.* at 8-9.

Since the fence was installed, "Federal agencies have been able to carry out their missions with substantially fewer major disruptions." Dkt.25, at 5. "The fence has improved the safety and security posture of the [building] by helping protect employees, visitors, tenant agencies, and physical infrastructure of the facility." *Id.* "It has also helped preserve the ability of agencies within the Facility to continue providing services to the public." *Id.* The fence "is a critical tool for maintaining order and safeguarding those who work in and visit the [building]." Dkt.26, at 12.

**C.** Plaintiffs are six individuals who seek to protest in the plaza. Five weeks after the fence was installed, they sued GSA under the Administrative Procedure Act (APA), alleging that GSA's decision to build the fence violated the First Amendment. Dkt.1, at 10-14.[2] Several days after that, plaintiffs moved for a preliminary injunction and temporary restraining order. Dkt.4. The district court denied a temporary restraining order and ordered expedited briefing on the motion for a preliminary injunction. Dkt.12.

---

[2] Plaintiffs' complaint also advanced three other APA claims. Those claims, which the district court did not rely upon in issuing its injunction, are not before this Court. Dkt.42, at 12-13.

On June 22, the district court orally ordered the government to remove the fence within 48 hours. Dkt.31; Dkt.39, at 127. The court extended the compliance deadline to July 2 at 7:00 a.m., Dkt.38, and this Court initially administratively stayed the order through June 29, Order (June 26, 2026).

The district court's written opinion, issued on June 26, determined that plaintiffs were likely to succeed on the merits of their First Amendment claim. Dkt.42, at 20. The court noted that the government did not contest for purposes of the motion that the Upper Plaza is a traditional public forum. *Id.* at 13. The court recognized that "[t]here is no dispute here that the construction of the fence is content neutral." *Id.* at 14. And the court found that "[t]here is no dispute that [the government's] stated interests" "to protect the building, its employees, and its visitors, and to allow for repairs and hardening of the lobby and exterior doors following the January 30, 2026 riot" "are significant." *Id.* at 15.

Despite recognizing the obvious importance of protecting federal property and personnel, the district court questioned the government's assessment of how much fencing was necessary and where the fence should be placed. The court faulted the government for installing the fence "based on the topography of the site." Dkt.42, at 17. And the court even proposed its own "rough-sketch-on-the-back-of-an-envelope sort of ideas about how we can -- you can protect that building." Dkt.39, at 90-91; *see also id.* at 87-120 (speculation about how the fence could be redesigned). At one point, the court noted its own "reuse [of] a bunch of . . . 2 x 6's for demo projects" as

a basis for finding that the government "could probably find a whole lot of . . . the material already present" to accommodate the court's proposed fence design. *Id.* at 118.

Next, the district court effectively collapsed the merits inquiry with the remaining preliminary-injunction factors. The court concluded that, "[g]iven Plaintiffs' likelihood of success on the merits here, they have also established a likelihood of irreparable harm," particularly because "our nation is set to celebrate the 250[th] year of independence." Dkt.42, at 21. Similarly, the court concluded that "[i]n light of [its] finding that Plaintiffs are likely to succeed on the merits of their claims that the construction of the Perimeter Fence violates the First Amendment," both the balance of equities and public interest "weigh strongly in favor of injunctive relief." *Id.* at 22.

The government moved for an administrative stay of the district court's written order and opinion, which this Court granted. On June 30, this Court remanded for the "court to consider and clarify" alternative fencing options and extended the administrative stay "until the issuance of district court's further order." Order. That same day, the court held an evidentiary hearing on four-and-a-half-hours notice, Dkt.46, and issued an opinion and order clarifying its factual findings, Dkt.51. The court determined that "issuance of *this* order terminates the administrative stay" and the preliminary injunction "remain[s] in place." *Id.* at 11. The court reiterated that the government must remove the fence by 7:00 a.m. on July 2. *Id.*

## ARGUMENT

The government is entitled to an extension of the administrative stay and a stay pending appeal of the preliminary injunction because the government is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

### I.  The Government Is Likely To Succeed On The Merits.

The district court's novel and expansive First Amendment theory—that the First Amendment is implicated whenever the government restricts public access to property that it owns—is baseless.  And the court failed to independently analyze the remaining preliminary injunction factors apart from its finding that plaintiffs are likely to succeed on the merits.  This Court should stay the injunction.

**A.**  To "evaluat[e] First Amendment claims relating to speech on government property," courts often employ "an analytical framework known as 'forum analysis.'"  *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).  Public fora include "places which by long tradition or by government fiat have been devoted to assembly and debate" (traditional public fora) and "public property which the state has opened for use by the public as a place for expressive activity" (designated public fora).  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).  The government may regulate the time, place, and manner of expressive activities on public fora when such regulations "are content-neutral, are narrowly

tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45. For all other property open to the public, the government may impose viewpoint neutral and reasonable speech regulations. *Id.* at 46 & n.7.

While forum doctrine can limit the government's ability to directly regulate expressive activities, "no one has understood the public forum doctrine" to prohibit the government "from closing a park, or eliminating a street or sidewalk." *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699-700 (1992) (Kennedy, J., concurring in the judgment). That is because the government is not "required to indefinitely retain the open character of" traditional public fora. *Perry*, 460 U.S. at 46; *see also First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1130 (10th Cir. 2002) ("The mere fact that a space is on what used to be a public street does not automatically render it a public forum."). Indeed, "the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use." *International Soc'y for Krishna Consciousness*, 505 U.S. at 699 (Kennedy, J., concurring in the judgment); *see also Venetian Casino Resort, LLC v. Local Joint Exec. Bd. of L.V.*, 257 F.3d 937, 944 (9th Cir. 2001) (recognizing that the government may close a public forum by "fundamentally alter[ing] the [property's] character or its use by the public"). For example, the government may permanently "withdraw[ a road] from public use for the purpose of

11

conducting nuclear testing." *Hale v. Department of Energy*, 806 F.2d 910, 915 (9th Cir. 1986).

Because the government may permanently close public fora, it follows that the government may also temporarily close public fora, so long as the closure does not discriminate based on expressive activity. Just as the government can close an open field to build a military base without undergoing First Amendment scrutiny, so too may it temporarily close that field to reseed it. In either case, the closure does not implicate the First Amendment because it is not a regulation of speech. To the contrary, the closure limits access to all members of the public, whether they wish to engage in expressive activity on the property or to access the property for other reasons having nothing to do with expression.

*Virginia v. Hicks*, 539 U.S. 113 (2003), illustrates why the First Amendment does not come into play. There, the Richmond city council permanently privatized streets within a housing development, "closed [the streets] to public use and travel and abandoned as streets of the City of Richmond," and conveyed the streets to the Richmond Redevelopment and Housing Authority (the Authority). *Id.* at 115-16 (quotation marks omitted). The Authority then enacted a policy providing that Richmond police were to notify any person without a permissible basis to be present (tenants, employees, and business or social visitors) that they were not allowed on the property and could be arrested for trespassing if they returned. *Id.* at 116.

12

The Supreme Court held that this policy was not invalid under the First Amendment. The Court explained that the "rule subjects to arrest those who reenter after trespassing and after being warned not to return—*regardless* of whether, upon their return, they seek to engage in speech." *Hicks*, 539 U.S. at 123. The rule would "apply to *all* persons who enter the streets of [the housing development], not just to those who seek to engage in expression," including "strollers, loiterers, drug dealers, roller skaters, bird watchers, [and] soccer players." *Id.* The Court emphasized that it is a person's "nonexpressive conduct—his entry in violation of the notice-barment rule—not his speech, for which he is punished as a trespasser." *Id.* (emphasis omitted).

The First Amendment thus does not give speakers carte blanche to violate generally applicable restrictions on access to government property. "[A] law of general applicability does not 'offend the First Amendment simply because [its] enforcement' may have an 'incidental effect[ ]' on speech." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (second and third alterations in original); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991) ("The First Amendment does not forbid" application of a law "generally applicable to the daily transactions of all the citizens."). For example, a speaker is not "justified in ignoring the familiar red traffic light because he . . . sought . . . to direct public attention to an announcement of his opinions." *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) (recognizing that a law restricting traffic on public roads "cannot be disregarded by the attempted exercise of

13

some civil right which in other circumstances would be entitled to protection"). Similarly, the First Amendment does not insulate protestors from a generally applicable trespass law even if they were engaging in First Amendment protected protest activity. *Adderley v. Florida*, 385 U.S. 39, 40-42 (1966) (rejecting First Amendment challenge to application of state trespass law to protestors who demonstrated on a county jail driveway); *see also Brunette v. Humane Soc'y of Ventura Cnty.*, 40 F. App'x 594, 596 (9th Cir. 2002) (unpublished opinion) ("The First Amendment is not a license to trespass.").

At bottom, the First Amendment does not abrogate the government's property "right to exclude others, 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). Nor does the Constitution permit members of the public to limit the federal government's property rights through an adverse possession theory of the First Amendment.

**B.** These principles foreclose plaintiffs' First Amendment challenge. Like trespass laws, the fence restricts access to the Upper Plaza to all members of the public, "not just to those who seek to engage in expression." *Hicks*, 539 U.S. at 123. Joggers, tourists, and picnickers—not just those who wish to engage in expressive activities—are equally excluded. The First Amendment does not afford plaintiffs a special right of access to federal property simply because they wish to engage in First Amendment protected activity. *See Linthicum v. Wagner*, 94 F.4th 887, 897 (9th Cir.

14

2024) (Bybee, J., concurring) (rejecting the plaintiffs' argument "that because they were exercising a free speech right, they were excused from other rules").

That is especially true here because, as the district court found, the government closed the Upper Plaza for reasons entirely unrelated to plaintiffs' speech. The court determined that the government began considering installation of a security fence in response to concerns that protest activity was "interfering with agency missions, accessing the courtyard, and disrupting Facility operations." Dkt.42, at 6 (quotation marks omitted); *accord id.* at 15 (similar). And the court found that the fence was specifically "designed to protect the facility, to protect its occupants and visitors, to allow a setback for ongoing repairs to damage caused during the [January 30] riot, and to allow contractors to complete a hardening project on the lobby and exterior doors of the facility." *Id.* at 8. That layout, the court recognized, was also "the easiest and fastest way to get the fence up" "in light of the topography at the site." *Id.* The court evidently disagreed with how much fencing was necessary to accomplish the government's security goals, but the First Amendment does not render that security determination unconstitutional.

The district court fundamentally misunderstood the First Amendment by equating a general closure of federal property with a speech regulation. The First Amendment applies when the government regulates *expression*: when the government imposes noise limits on music played in public parks, *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), or prohibits solicitation on public streets, *Comite de Jornaleros de*

*Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011), or requires street performers to obtain permits, *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009). But the First Amendment does not apply when the government simply closes its property to public access. *See, e.g.*, *Hicks*, 539 U.S. at 123; *Adderley*, 385 U.S. at 40-42. As this Court recognized in *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996), "[p]roclaiming a curfew that requires people to remain at home during certain hours is obviously an entirely different matter from prohibiting only specific First Amendment activities during those or other hours." *Id.* at 1374.

The district court's reasoning, under which the First Amendment is violated whenever a government restricts access to more of a sidewalk or street than a court agrees is necessary, would constitutionalize decisions made by governments across the country every day. Governments frequently close public sidewalks and streets to perform repairs or construction projects; some of those closures are permanent, as when the government constructs or expands a federal building. *See, e.g.*, U.S. GSA, *GSA Announces Reopening of Front Street to Vehicle Traffic* (June 21, 2021), https://perma.cc/FC46-LXJZ (announcing reopening of street closed for 21 months and continued closure of sidewalks during construction project at Edward J. Schwartz Federal Office Building). Governments also regularly impose nightly curfews on public parks, thereby restricting public access to a traditional public forum. *See, e.g.*, 56 RCNY 1-03(a)(1) ("Persons may enter and use the parks from 6:00 a.m. until 1:00 a.m. unless other open hours are posted at any park."). The court identified

16

no authority suggesting that any of these closures are subject to heightened constitutional scrutiny. And "seek[ing] to extend the constitutional guarantees to new territory . . . suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd sub nom.*, *United States v. Skrmetti*, 605 U.S. 495 (2025).

Nor did the district court identify any case law to support its view that the First Amendment empowers courts to superintend construction projects on federal property by determining how much property must be closed to achieve a governmental goal. Courts are not construction managers: they lack the expertise to determine how much of a road closure is necessary for a sewer replacement project, how long a sidewalk should be closed after concrete is poured, or where a security fence should be placed around a construction zone. The First Amendment's narrow tailoring analysis is not a license for courts to determine that the road could have been closed by one foot less, or the sidewalk could have been opened an hour sooner, or the fence could have been installed closer to an excavation pit. Nor does a district court's experience "reus[ing] a bunch of . . . 2 x 6's for demo projects" qualify the court to find that its proposed redesign of a security fence is feasible. Dkt.39, at 118. Because such construction closures do not regulate speech, they are not subjected to First Amendment means-end analysis.

17

The upshot of the district court's adverse possession theory of the First Amendment is that the government will be subject to constitutional scrutiny whenever it restricts public access to portions of its property that have previously been used for protest activity. Under that rule, the government's incentive is to preemptively install fences around all its property, lest it lose the chance to do so later when security concerns arise. That result hardly serves the interests in free expression that the court purported to protect.

**C.** For the reasons just explained, the fence does not implicate the First Amendment and forum analysis is inapplicable. But even under the district court's approach—analyzing the plaza as a public forum and the fence as a speech regulation—the fence would still be constitutional because it is content neutral, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *Perry*, 460 U.S. at 45-46.

At the outset, it is undisputed that the decision to install the fence was content neutral. Dkt.42, at 14. But the court found that the fence's particular dimensions too large to be narrowly tailored to the government's undisputed significant interests in protecting the public and federal property. Dkt. 39, at 81, 87. That misapplied the narrow tailoring analysis. As the Supreme Court has explained, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S.at 799 (alteration and quotation marks omitted). Because the fence

promotes the government's significant interests in protecting public safety and federal property, and because without the fence those interests would not be achieved as effectively, the fence is narrowly tailored.

In addition, ample alternative channels for communication remain available—including more than 5,000 square feet of space on the Lower Plaza. In concluding otherwise, the district court found that the Lower Plaza was a worse location for plaintiffs' speech, noting factors like the lack of benches and inadequate shade, as well as the greater distance from "the causal source of Plaintiffs' grief." Dkt.42, at 19-20. But none of the court's findings shows that the fence "eliminates the only method of communication by which speakers can convey their message to a particular audience." *Project Veritas v. Schmidt*, 125 F.4th 929, 957 (9th Cir. 2025) (en banc); *id.* ("[The] alternative channel need not be ideal, but merely adequate.").

**D.** The district court also erred in its analysis of the other preliminary injunction factors by collapsing *Winter*'s four-factor test for preliminary injunctive relief into a single factor: likelihood of success on the merits. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under *Winter*, plaintiffs must establish likelihood of success on the merits, likelihood of irreparable harm absent preliminary relief, that the balance of equities tips in their favor, and that the injunction is in the public interest. *Id.* But the court found that "the only issue [the court had] to determine is likelihood of success on the merits." Dkt.39, at 40; *accord* Dkt.42, at 21-22 (similar).

19

The district court conducted no additional analysis as to those factors other than its conclusion as to the likelihood of success of plaintiffs' First Amendment claim. So even if the court's merits analysis is correct (which, as just explained, it is not), the government is nonetheless likely to prevail on the merits of the appeal of the preliminary injunction because, for the reasons below, the balance of the equities and public interest favor the government.

## II.  The Remaining Stay Factors Decisively Favor The Government.

The Court should stay the injunction because the government and public interest will be irreparably injured absent a stay.

The injunction endangers federal employees, members of the public, and the building itself. As set out above, the fence was installed following numerous violent incidents. Since it was installed, "[t]he fence has improved the safety and security posture of the [building] by helping protect employees, visitors, tenant agencies, and physical infrastructure of the facility." Dkt.25, at 5. "[It] is a critical tool for maintaining order and safeguarding those who work in and visit the [building]." Dkt.26, at 12. FPS thus advises that the fence should "remain[] in place until all necessary security upgrades are completed and the risk of harm to the facility and its occupants is substantially mitigated." *Id.* And, according to FPS, "[i]f the fence were to be removed, it is likely that incidents of violence directed at the facility would increase consistently with the pattern observed prior to the fence's installation." *Id.* The government has "an uncontested interest in the protection of federal agents and

property," as well as public safety, meaning that "[b]oth irreparable harm and the public interest weigh in [the government's] favor." *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (per curiam).

It is also inequitable to require removal of the fence before the government can seek this Court's review of the preliminary injunction, which imposes significant and unrecoupable costs on the government. And the government would incur additional costs to reinstall the fence were it to prevail on appeal. That is why, when exercising their equitable powers, courts abhor compelling the wasteful destruction of property. *See, e.g.*, *Golden Press, Inc. v. Rylands*, 235 P.2d 592, 595 (Colo. 1951) (declining to order footings of building destroyed despite property line encroachment).

Finally, by micromanaging how the Executive Branch maintains federal property, the injunction aggrandizes the district court's power over Executive Branch decision-making, transgressing the separation of powers. The court second-guessed the government's assessment as to how much fencing was necessary and how the fence should be designed, faulting the government for installing the fence "based on the topography of the site," Dkt.42, at 17, and proposing its own "rough-sketch-on-the-back-of-an-envelope sort of ideas about how we can -- you can protect that building" and how "the perimeter is going to be moved in." Dkt.39, at 90-91; *see also id.* at 87-120 (further discussion about how the fence could be redesigned). Such decisions are entrusted to the Executive Branch, not the federal courts. Article III does not "transfer from politically accountable officials to the courts the decision as

21

to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453-54 (1990). Yet that is precisely what the injunction purports to do.

By contrast, plaintiffs fail to establish a likelihood of success on their First Amendment claim, much less irreparable harm. Plaintiffs identify no harm from the fence other than the alleged violation of their First Amendment rights, Dkt.4, at 13-14, and they waited five weeks after the fence was installed before filing this suit. Plaintiffs' "inability to demonstrate freely on [government] property is not a hardship" warranting a preliminary injunction because they remain free to engage in First Amendment protected activity on the Lower Plaza. *Hale*, 806 F.2d at 918. Even if the fence will result in some harm to plaintiffs, the balance of equities and public interest nonetheless favor the government, for the reasons explained. *See Winter*, 555 U.S. at 26 ("While we do not question the seriousness of [plaintiffs'] interests, we conclude that the balance of equities and consideration of the overall public interest in this case tip strongly in favor of the Navy."). The equities thus sharply favor the government.

## CONCLUSION

The Court should immediately extend the administrative stay to permit orderly briefing of the government's stay motion, then stay the preliminary injunction pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

SCOTT E. BRADFORD
   *United States Attorney*

MARK R. FREEMAN
STEVEN A. MYERS
   /s/ *Brenna H. Scully*
BRENNA H. SCULLY
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7211*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 880-6114*
   *Brenna.scully@usdoj.gov*

JULY 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,524 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ *Brenna H. Scully*
Brenna H. Scully

**ADDENDUM**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

NAPHTALI RENSHAW; SUSAN
BARNHART; TYRRAS WARREN;
MICHAEL CARRIGAN; CHRISTOPER
ROMPALA; and CHARLES AREFORD,

      Plaintiffs,

    v.

GENERAL SERVICES ADMINISTRATION,

      Defendant.

Case No. 6:26-cv-01127-MTK

**OPINION AND ORDER ON
REMAND TO CONSIDER AND
CLARIFY AUTHORIZED
ALTERNATIVE MEASURE**

---

**KASUBHAI,** United States District Judge:

Plaintiffs bring claims for declaratory and injunctive relief under the Administrative Procedure Act ("APA") against Defendant General Services Administration ("Defendant" or "GSA") related to the installation of a fence surrounding the Eugene Federal Building in Eugene, Oregon. This matter comes before the Court on remand from the Ninth Circuit "to consider and clarify what alternative measures the Appellant is authorized to employ . . . the time line for such measures, and whether such alternative fencing can be constructed and accomplished without maintaining the perimeter fence." ECF No. 47.

Page 1 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

Add. 001

# BACKGROUND

## I.     Preliminary Injunction Hearing and Ruling

Plaintiffs filed this lawsuit on June 4, 2026, and filed a Motion for Preliminary Injunction and Temporary Restraining Order on June 8, 2026. The Court reviewed Plaintiffs' motion on the day it was filed and, noting that Plaintiffs had not satisfied the requirements for issuing a temporary restraining order without notice to the adverse party under Rule 65(b)(1), denied that portion of the motion. ECF No. 12. The Court also ordered an expedited briefing schedule on the Motion for Preliminary Injunction and set the matter for an evidentiary hearing and oral argument on June 18, 2026. *Id.*

At oral argument, Plaintiffs called multiple witnesses to testify in support of their motion. While submitting declarations in support of its position before the evidentiary hearing, Defendant declined to call any witnesses. Because the Court was inclined to develop a full evidentiary record, the Court instructed Defendant's counsel to arrange the appearance of Ryan Anderson—the Building Manager for the Public Building Service (a division of Defendant GSA) for the Eugene Federal Building—to appear and develop a sufficient record. After an extensive evidentiary hearing, site visit, and oral argument, the Court issued a detailed oral ruling granting the preliminary injunction on June 22, 2026, and ordering removal of the perimeter fence. ECF No. 31. Though noting it would provide a formal written opinion, the Court went to great lengths to provide a robust description of its reasoning for granting the motion so that Defendant could properly evaluate whether to appeal the Court's order even in the absence of the written opinion. Tr. of June 22, 2026 Hearing at 39:22-40:5, 79:3-87:10, ECF No. 39.

Having found that Plaintiffs satisfied the required factors for a preliminary injunction, the Court invited discussion as to the scope of the remedy. It did so even though Defendant's opposition to Plaintiffs' motion did not raise any objection to Plaintiffs' requested remedy,

Page 2 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

Add. 002

contesting only whether Plaintiffs satisfied the requirements for the Court to grant a preliminary injunction in the first instance. The Court was interested in whether there was an alternative fencing option available that might be appropriately narrowly tailored to the government interests at issue. After some discussion, the Court authorized a single alternative fencing design that would involve fencing just under the breezeway along the edges of the main building and along the doors and windows directly against the annex. The Court's proposal is pictured below, with the proposed fencing depicted in pink highlight superimposed over blue pen.



At the hearing on June 22, 2026, Defendant failed to provide any meaningful details about timing and process for moving the existing perimeter to the location this Court indicated would be authorized. Moreover, Defendant did not express any serious interest in undertaking

Page 3 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

the authorized alternative. Further, the Court did not have confidence that Defendant and its counsel would use any additional time to consider implementing the authorized alternative to further resolution. Ultimately, the Court determined that restoration of the status quo (removal of the perimeter fence) was the most viable, timely, and certain prohibitory injunctive remedy and ordered the fence removal. The Court declined to order Defendant to adopt the proposed reconfiguration. However, the Court authorized Defendant to implement the alternative fencing the Court proposed on GSA's own timeline following the removal of the existing fencing. The Court ordered that the perimeter fencing be removed within 48 hours. ECF No. 31.

## II.    Extensions and Stays

On June 23, 2026, Defendant moved for an eleven-day extension of time to comply with the Court's order, from June 24, 2026, to July 5, 2026. ECF No. 33. Defendant represented that permitting and scheduling of the work would take 7-10 days. Second Anderson Decl. ¶ 8, ECF No. 34. At oral argument on June 24, 2026, the Court concluded that no work could feasibly be be completed between July 3, 2026, and July 5, 2026 due to the holiday weekend, and that Defendant would likely be able to obtain a permit on an expedited basis given its working relationship with the City of Eugene. ECF No. 38. In the colloquy between the Court and Defendant's counsel, the Court was met with uncertainty about whether Defendant could timely obtain the permit from the City of Eugene, and Defendant's counsel was silent and failed to explain how work might even be performed on the requested date of extension, July 5, 2026.

The Court also noted the importance of ensuring that the Federal Building Plaza, as a traditional public forum, should be open on the Fourth of July. Because Defendant represented it would need 12 hours to complete the work and the work would be performed through the night, the Court granted the extension in part, ordering that Defendant GSA must begin removing the

Page 4 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

perimeter fence by July 1, 2026, and the fence must be fully removed by July 2, 2026, at 7:00AM. ECF No. 38.

The Court issued its written opinion on June 26, 2026. ECF No. 42.

On June 26, 2026, the Ninth Circuit issued an order administratively staying the Court's order until 5:00 p.m. Pacific Time, Monday June 29, 2026. ECF No. 41. That stay was later extended in response to a renewed motion by Defendant until 10:00 a.m. Pacific Time on Tuesday June 30, 2026. ECF No. 44.

On Tuesday, June 30, 2026, before the expiration of its stay, the Ninth Circuit issued the order currently before the Court, remanding for this Court "to consider and clarify what alternative measures the Appellant is authorized to employ (as described in the District Court's Opinion, Dist. Dkt. 42, at page 24, footnote 5), the time line for such measures, and whether such alternative fencing can be constructed and accomplished without maintaining the perimeter fence." ECF No. 47. The order further stated that its interim stay would remain in place "until the issuance of district court's further order." *Id.*

### III.    June 30, 2026, Evidentiary Hearing

On June 30, 2026, the Court convened a hearing to comply with the Ninth Circuit's order to clarify and consider the alternative fencing it authorized in footnote 5 of its Opinion and Order. The Court heard testimony from Mr. Anderson and from Federal Protective Services Area Commander William Turner. The following serves as the Court's response to the Ninth Circuit's remand order.

### DISCUSSION

The Court begins by confirming the specific issues remanded by the Ninth Circuit. The Court understands it was directed only to "consider and clarify" the Court's authorized alternative depicted in the aerial image that appears earlier in this opinion. That image depicts the

Page 5 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

only alternative described in footnote 5 of the Court's Opinion and Order, and the only one Defendant was "authorized to employ." The Court also understands that the Ninth Circuit directed it to further explain the authorized alternative and develop the record relating to (1) the timeline associated with that alternative and (2) whether it could be "constructed and accomplished without maintaining the perimeter fence."

The Court understands the Ninth Circuit did not reverse and remand directing the Court to reconsider its decision, order reopening of the record on the merits of its decision granting Plaintiffs' Motion for Preliminary Injunction, or to allow parties to raise new arguments and present evidence it otherwise failed to present at the time of the original evidentiary hearing. With those limitations in mind, the Court makes the following findings of fact based on the testimony presented at the June 30, 2026, evidentiary hearing:

## I.    Factual Findings

### A.    Based on the Testimony of Mr. Anderson:

1. Defendant has retained a contractor to disassemble the existing perimeter fencing and store it on site for a cost of $58,790. As of the time of this hearing, no plans have been implemented to coordinate the removal of the fencing from storage on the building site. The Court concludes that if the fencing remained on site, it could be reinstalled with minimal cost.

2. The contractor and its crew was on site on June 29, 2026, and Mr. Anderson believes they are still present in Eugene, Oregon as of June 30, 2026. Some equipment, including restrooms and a forklift, are already staged at the site.

3. The contractor obtained a permit to complete the work associated with the removal and on-site storage of the perimeter fence from the City of Eugene on June 26, 2026. The

permit authorizes overnight work on Monday, June 29, 2026, through Wednesday, July 1, 2026.

4. Equipment, including a forklift to move concrete blocks and fencing, and portable toilets are currently staged at the building site.

5. The Court finds Defendant is fully capable of timely complying with its order to remove the perimeter fencing by July 2, 2026, 7:00AM.

6. The existing perimeter fencing consists of panels that may be moved, stored, and reassembled in different configurations.

7. To implement the Court's authorized alternative, as pictured earlier in this opinion, GSA would be able to repurpose the existing perimeter fencing. Thus, in answer to the Ninth Circuit's inquiry, the existing fencing would necessarily *not* remain in place while the Court's authorized alternative is implemented, should GSA decide to implement it.

8. To implement the Court's authorized alternative on the main portion of the Federal building (not including the annex), GSA believes the existing fencing likely contains enough panels to complete the work.

9. Altering the existing scope of work for the perimeter fence removal to also encompass moving the fence along the main building (not including the annex) would be subject to an expedited process, requiring approval from GSA contracting officer, Mr. Huynh, in San Francisco. Mr. Anderson was not confident the necessary modification to the scope of work could be made by July 2, 2026, and gave no timeline associated with that expedited process.

Page 7 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

10. Federal Building annex depicted on the image provided earlier in this Opinion no longer houses Veterans Affairs services. To implement the portion of the Court's authorized alternative on the currently-vacant annex, GSA would need to acquire approximately 40 additional fencing panels, as well as gates and electronics necessary to install a crashbar on the gates to ensure safe exit. Mr. Anderson estimated the cost for protection of the vacant annex under the Court's authorized alternative could be between $100,000 and $150,000.

11. To implement any plan that requires acquiring additional fencing panels, including the Court's authorized alternative as it relates to the annex, GSA would require 30-34 days to go through the required process to secure GSA approval, funding, and a contractor. In the interim, plywood panels could be used to protect at least some of the windows in the annex.

12. Although GSA represented earlier that the hardening project (installing steel doors and reinforced glass in the atrium) of the federal building would take in the range of 18 months, requiring a 2-year temporary fence, Mr. Anderson learned on June 30, 2026, that the anticipated completion date for the hardening project has now been accelerated, and is scheduled to be completed by December 22, 2026.

13. The hardening project described in paragraph 12 does not include altering any glass windows on the second floor, or the several glass panes on the first level that are not adjacent to the atrium.

### B.    Factual Findings Based on the Testimony of Commander Turner

14. Commander Turner did not consider the Court's authorized alternative sufficiently protective. He believes it does not adequately protect second floor windows.

Page 8 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

15. The Court notes that there are currently no plans for reinforcing the second story glass panes. So even after the only current plan to harden the doors and the glass in the atrium is completed, and when the fence would have otherwise been removed after this hardening, the second story glass would remain unaltered.

16. Before the perimeter fence was constructed, Commander Turner brought in other officers from around the country to provide adequate security to the Federal Building. Construction of the existing perimeter fencing allowed FPS to return to normal operations and provided clear jurisdictional delineation between local police (outside the fence) and FPS (inside the fence).

17. Fence removal and the Court's authorized alternative would both require a return to the same level of security staffing that existed before the installation of the perimeter fence. In other words, Commander Turner saw difference in staffing needs between fence removal and placing the fence as described in the image included earlier in this opinion.

18. FPS has a staffing plan in place for the existing plan to remove the fence consistent with the Court's ruling.

## II.    Clarification and Consideration.

With respect to the Ninth Circuit's instruction to "consider and clarify what alternative measures the Appellant is authorized to employ (as described in the District Court's Opinion, Dist. Dkt. 42, at page 24, footnote 5), the Court has provided the image earlier in this opinion depicting the authorized alternative. Both parties were provided with this image at the June 22, 2026 hearing.

Following further factual development as discussed above, the Court further clarifies that the authorized alternative involves a repurposing of the existing perimeter fencing to ensure that

Page 9 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

the traditional public forum at issue remains open while protecting the building, its employees, and the public.

The evidentiary record developed at the June 30, 2026, further confirms to this Court the necessity of focusing the prohibitory injunctive relief on the removal of the fence rather than the implementation of the Court's authorized alternative fencing. That is so because (1) the perimeter fencing would necessarily need to be disassembled to implement the Court's authorized alternative and (2) the timeline associated with implementing the authorized alternative in full (including protecting the annex) is 30-34 days, which this Court finds an unreasonable delay in light of the First Amendment freedoms at stake.

Even the expedited timeline to incorporate the main building portion of the Court's authorized alternative is speculative. Mr. Anderson was unable to provide a timeline, and GSA is unable to provide any helpful consistency in providing timelines on which this Court can rely in attempting to fashion an appropriate remedy. A few examples of this inconsistency include in the inconsistent testimony on the subject of obtaining a permit when Defendant sought an extension, and more recently the surprise acceleration of the timeline to complete the hardening project.

 Further, it is unnecessary that removal of the fence and reconfiguration of the same panels occur at the same time given GSA's intent to store the fence components on site and repurpose it for any alternative fencing.

Finally, Commander Turner's testimony that the Court's authorized alternative would require the same level of security staffing as would a "no fence" alternative raises questions about whether such an alternative furthers the Government's interests.

To be clear, after a meaningfully developed record on June 18, 2026, wherein both parties were given ample opportunity to present all the relevant evidence it chose to offer; after

Page 10 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

this Court's commitment to more fully understand the context of this evidence by conducting a site visit that same day; and after engaging in an effort to craft a mutually agreeable solution that acknowledged the seriousness of the Defendant's violation of Plaintiffs' First Amendment and Defendant's real and reasonable concerns for ensuring the safety of personnel and property, the Court found a Defendant disinterested in a solution other than a formal decision on the merits. Rather than ordering a mandatory injunctive remedy to move the fence, and given Defendant's incapacity to provide certain timelines even now, the only thing this Court can and should do is order a return to the status quo—the removal of the existing perimeter fence.

## CONCLUSION

The foregoing serves as the Court's consideration and clarification of the matters outlined in the Ninth Circuit's June 30, 2026 Order, and the Court understands that by operation of that order, the issuance of *this* order terminates the administrative stay. This Court's orders remain in place, and Defendant GSA must begin removing the perimeter fence by July 1, 2026, and the fence must be fully removed by July 2, 2026, at 7:00AM. A hearing remains set for 9:00AM on July 2, 2026, to determine Defendant's compliance.

DATED this 30th day of June 2026.

_____
MUSTAFA T. KASUBHAI (he/him)
United States District Judge

Page 11 — OPINION AND ORDER ON REMAND TO CONSIDER AND CLARIFY AUTHORIZED ALTERNATIVE MEASURE

Add. 011